You may proceed. Thank you, Your Honor. Morning, and may it please the Court. This past Sunday, October 6th, when I was looking over the record in this case, was the 26th anniversary of the signing of the agreement that gives rise to the contract claims in this case. And I think to state that fact kind of highlights the contract issue before us today. Was that the opening act? Was that just the first 26 of 264 years? Or somewhere during that 26-year period of time did we have a right to terminate this agreement? Incidentally, the 26th Amendment of this agreement, the actual rail line, this Borger line that runs off from the BNSF track to these chemical plants, the record shows is coming up on 100 years, somewhere in its 90th anniversary, depending on how you measure that. So this question of the scope, duration of this contract and our rights, as PNR's rights, to terminate this contract, it's defined by Illinois law. There's been a lot of briefing about the cases. I was hopeful in my time here I could speak to two aspects of those cases, both state and federal, applying Illinois law on this question that I think provide perspective, sort of a structure, from which I think we can see what I think would be the correct result in this case. The two aspects being, one is textual, what our agreement says compared to certain other cases and the language they have focused on. The second is practical, the type of business relationship that is created by and involved with this agreement. The textual point is the right of termination that's actually set out in the agreement. I'm not sure there really is one. There's a right, there's a clause that talks about modification, requires it to be done by a new contract of the parties in writing. That is very similar text-wise to the RICO case from five years ago, the Illinois Court of Appeals, and I believe that substantively it's the same as the clause in Jesperson. They were different. There's some distinctions in language, but what the clause in Jesperson, the text of it, had some provisions that allowed termination in the event of material breach. And what it said about that and what RICO said picking up on a similar provision that required writing to have a modification is those are of no moment. They're simply just saying rights you already have. You already can terminate if there's a material breach. You can already agree to modify if you put things in writing. That's something the law gives you anyway. So functionally and linguistically in the case of RICO, the text of our agreement is on point with the leading Supreme Court case in Illinois and the most relevant Court of Appeals case since then. The practical question, the type of relationship. There are, I found, I think there are two aspects of the Illinois cases, but the punchline is best explained in the Wurlitzer case. There's a bunch of names, Baldwin, the one about the jukeboxes. But it distinguishes between cases where things are done already and cases where there is an ongoing business relationship with ongoing back and forth dealings between the parties. This is skipping ahead to the injunction part of the briefing, but there's this line of cases about injunctions and specific performance and the language you see in the old contract cases is you can't make a caged circuit and Baldwin summarizes that sort of authority, says it's why employment relationships are generally terminable at will, and discusses about how the relationship in that case was distinct. But if you look at cases where the Illinois courts or courts applying Illinois law have been willing to find a termination condition or to otherwise not apply Jesperson and RICO, it's because something already happened, a salesman made the connection, brought in the big client and is going to get paid a certain percentage from there on out, or there is some question raised about the recoupment of some sort of investment. Someone put a bunch of money in and it seems, or there's an option that's been agreed upon and it seems fair under the circumstances that for some amount of time the contract be allowed to continue to have, so that can be brought to fruition. But not one, not one case under, from an Illinois case court since Jesperson or in the recent history preceding that, or from the Seventh Circuit, has involved language like this and an ongoing relationship where we have to deal with these people every day. The contract, this provision that they cite about this handling carrier relationship is in Section 3, it's each other back and forth about how you line up the cars and who's responsible for the stuff on them and who has to store things and that kind of thing. And that is classic caged bird type stuff, and it's something that would be, it is unprecedented under Illinois law to find you don't have a right to get out of that kind of relationship when there is no defined term. I guess, I mean, the array of arguments that they offered that were persuasive to the district court here was that, yes, this is exactly what you said, 26-year long relationship, even 100 years, and therefore railroad contracts are distinctive under Illinois law, one. And when you look at this one, it's integrated, it had three parts, and it contemplated that BNSF would give its portion of consideration early, but your client then had this ongoing relationship. Sure. And then the final portion of their argument, if you can keep it all in your head, is that actually the text allows for multiple ways to get out. You could assign your rights to somebody else, you could, as you did, mutually revise it repeatedly, and maybe most importantly, if they ever didn't pay you correctly, you could sue them for breach. Right. I can always terminate in the event of a material breach. I can always assign. But Jesperson looks just at this language of termination, not whether you have other rights to do something termination-like or a right in common law to terminate for breach. I think those are distractions. Do you think then Judge Easterbrook went a bit afield when he started really looking at all the practicalities and he said, yeah, in a single-incident contract, both people consideration at the same time, it won't be a servitude forever. But where one side performs early and the other one has to perform with multiple ways to adjust, then it would be absurd to say, you gave it all, and now this guy can walk away from it. As to the termination provision in that case, it's different than Jesperson. His points are well taken. There is more in there than just termination for material breach. As to the right to walk away, what he says there is these people were trying to separate from each other. The various Wurlitzers that had a falling out and they were trying to end. The license agreement was part of a termination agreement. And they were done. All they had to do was have the license agreement in place to keep them apart from each other. Nobody had to go back and forth and do all the things in this type of agreement. And he goes on to discuss, I was referring to it earlier, the cases that do allow a mutual right of termination when you have that kind of ongoing relationship. So I think his points are well taken as to certain aspects of this. Let me just say RICO, which is I guess your favorite case. RICO came out after Baldwin, I believe. That is the case you principally say applies? It is the best case on contract language, no doubt about that. But RICO did say that railroads are a special case. I'm at a loss for this. I understand what the court is saying and what they're saying in the briefing. The one case they cite about railroads is from a long, long time ago. It was talking about construction, for one thing, or not construction. It was talking about a unique policy issue of 100 years ago, this construction of a union terminal somewhere in Chicago. And then it kind of went from there. The part of that opinion, this Illinois Central case that talks about this issue is one paragraph at the end. The other 95 percent leading up to it talks about some unique policy issues, but not a thing in the world to do with this relationship. This relationship, I mean, we're not — this isn't about trains. It's not about track. The track's been there a century. It's not about the trains. We've been out of this contract for a year. We bonded. The injunction is not in place. We've been handling freight there as a common carrier. And the trains come and the trains go. The only thing this is about is whether customers get two bills, one from BNSF, one from us, and one — or one integrated bill from BNSF. That's it. Paragraph one of the seven or eight things that carriers do. And so I think — I come back now to the first of your points, Judge Higginson. That is the thing that we have to evaluate as consideration for this property. Was BNSF — did it seriously accept an amount of money for a railroad track and a whole bunch of other stuff? It's all detailed in this contract. And a material part of that consideration was a provision under Illinois law, terminable at will, that could end tomorrow if the plant shut down or if business changed of no particular value to it. People, when they buy real estate, they say, I'm going to pay some money today. I'm going to pay a certain amount over time. Or they have some kind of security interest in their agreement to ensure that they're going to get a certain return back. Here, you don't have that. You have an exchange of consideration — by the way, one that says in paragraph two of this agreement, for the rights and interests conveyed, P&R shall pay, suggesting that there's a matchup there between the amount that was paid and the real estate that we received. And then there's a lot of administrative things that we agree to do to make this run smoothly while it's running. This being one of those administrative things, that makes some sense. You said if the contract's terminated, the only thing that matters is who's billing the customer. But, well, if it's terminated, does BNSF get any revenue off of transport on the borderline? Once some initial kinks have worked out, no. BNSF gets paid for what it does up to where we get it, and then we get paid, which is the way it would be under the other agreement, too. BNSF charges something, and then under the agreement, it remits to us a percentage. That makes a big difference to them, doesn't it, to lose the revenue on those — The revenue they're supposed to give to us. It's supposed to be — Not all of it, though, huh? Well, I don't know what the record says about that. They had the opportunity to prove lost revenue in their — in relation to this particular claim, said they couldn't do it, didn't try to do it. The only damage numbers related to a disgorgement from us of claimant profit, or some problems where they had a contract with what I think of some overhang, they rigged it a certain way, it had a duration period, and they ended up sort of double-collecting and owing some people back until the agreement expired and the new one was able to be lined up. But the actual — what they tried to prove in terms of damage, zero value, none. The — us, it's night and day. That's all we get paid is what we get reimbursed, which, by the way, is this notion of consideration and them getting paid over time for the property. But we're getting paid — we're making investments, too. That's why that line of cases matters so much under Jesperson. We're out there working the track, doing these things, fixing things. We've got a business to run as well. And our costs and profitability decisions are just as important as theirs in the ongoing business relationship. And Jesperson says after a while, that becomes controlling, because at some point you just are back in the world of buggy whips. A couple of other factoids about this — how this — the pieces — things in the record, they're a little scattered in the briefing, and I wanted to be sure we highlighted when we looked at this, you know, what is exchange at the time of the closing? There's money paid. We get a bunch of deeds back. We have these administrative responsibilities are defined. Evidence shows that they had done — BNSF had done 40-odd of these transactions in years around that. There had just been deregulation. They were trying to sell off real estate and make some money. Record 41-171 has some testimony about that. And Exhibit 140 that we cite in our briefing shows that this was dumped for salvage value. They wanted the line. And yeah, sure, they signed up some stuff to make sure it went smoothly going forward, as opposed to a common carrier relationship. But that was housekeeping. We committed to do it. They committed to do it back. We committed to do exactly what it said. Though exactly — It's sophisticated, and it's a long time ago, but I thought from their brief, they're saying the principal consideration they get is they get to control the prices to the clients of theirs that are really nationwide, that come on this little 30-mile, 31-mile thing. But your client kept wanting to add surcharges. But the contract gave them control over that pricing. Right. So the contract controls what we get paid. So we're stuck in perpetuity, operating at a loss. That's not fair. You've got to be reasonable each time you say — That's true, which then we would have to — I mean, we'd be in this position. We'd have to start a lawsuit with them and — But I thought there were some great amendments where you actually got that. There were several in the earlier years of the contract. And to the Jesperson point about the relationship changing, it changed. And PNR and BNSF got at loggerheads, and it got harder to get. Just my own question. Sure. It's helpful. This is clarifying. But you did have a point about the affirmative defense, and that — Yes. So — If you don't prevail on the first, could you get to that point? It ties directly to this. There was a series of amendments, some for specific types of freight, others that were a little more sweeping. The seventh related to a particularly noxious ammonia product, where they were willing to give us a concession. The eighth carried that forward and had a kicker, that if we went and did other things, we'd give up the benefit of that ammonia premium. And that was that. If you put the two next to each other, they look exactly the same, except eighth's got a couple extra sentences. We say it was a thing to make the ammonia deal stick. They say it was a wholesale revision of the pricing formula. Bottom line, it shows that we weren't getting along.  Business environments changed, regulation changed, and the business — tenor of the business between these two companies had changed. Earlier in the relationship, we'd probably have gotten it. By the Eighth Amendment, they're arguing that they got us, and we've got the whole price thing is done. And that's the question. Are we their servants? Is it ended at 25 years, or is this some sort of servitude that runs forever out there for no known value, no known profit? Back then. Railroad back. Sure, I suppose so. I don't know if they've made an offer lately. But we own it. It's ours. We have a fee title. We can do with it what we wish to do. Let me just ask you one more time. What's in the record on the economic incentives of this deal? That's one thing the district court looked at. So, two points I would like to make there, if I could. What it shows as to BNSF's incentive is they were dumping old lines like this to try to make some profit on the books after deregulation. That's Exhibit 140 and the bit of testimony I cited earlier. The district court also said there could be an absurd result that the day after the contract had been signed, we could say, ha ha, just kidding, and walk away. Of course, BNSF could have done the same thing. It could have shut down the line. We would have sat with an empty bunch of cars going off to Borger. That was a mutual business risk. The absurd result is what Jesperson says is no good, us being stuck in this contract forever. That's the economic incentive that should control today. Thank you, counsel. May I proceed, Your Honor? May it please the court. I want to begin by clarifying a few things. This notion of P&R being stuck in this agreement forever is demonstrably false. As Judge Higginson, your questions indicated, they can assign the agreement. They've got remedies in the event of breach. So they are not indentured servants, and they are not stuck forever. That's not an uncommon provision in a contract, though. Agreed, Your Honor. I mean, I understand what you're saying. But help me understand why these provisions in your contract are not just ordinary provisions that are in very many contracts. There's nothing unusual or unique about any of these provisions. And respectfully, Your Honor, I would say there are unique things about these provisions. And I would start with the assignment clause. It says it's assignable. It says BNSF's consent may not be withheld in the event of an assignment. And importantly, it says the assignee must assume all existing, continuing, and thereafter arising obligations. I mean, you're saying that's an unusual provision in a contract? From the standpoint of it being more robust in specifically referencing throughout the agreement this ongoing and continuing nature of the obligations. There's a paragraph in the agreement that says specifically the obligations of the parties are continuing. Well, what's unusual about that? Your Honor, I've never seen that in an agreement where it specifies that the obligations are continuing, and the language regarding each of those obligations indicates and emphasizes that continuing nature. And I think another provision that while maybe labeled ordinary, when you read the integration clause, it goes beyond the point of saying this is our entire agreement, as you would typically see in an integration clause. It goes one step further because it says all the rights and obligations of the parties are integral to this agreement. And then it goes another step further, and it says the consideration inducing these parties into this agreement includes all of their respective commitments to one another. And I think that is one of the biggest problems with PNR's argument. They are asking you to view a provision in this contract in isolation. They are only trying to terminate part of this agreement. They want to keep everything else. The thing that gives them the right, exclusive right, to provide local services and collect that revenue, they don't want to terminate that. They just want to terminate the rate-setting authority of BNSF. And importantly, that was never conveyed to them in the first place. They are taking something that they did not pay for, and it was not bargained for. As Council indicated, the Borger Line, built in 1926 by BNSF, to serve what is now the nation's largest inland petrochemical complex. And BNSF would not and did not jeopardize its relationships with those customers to have a third party controlling cost for the last or first 31 miles. Because BNSF's world is considerably larger, and it is a bit of the tail wagging the dog economically to think that if BNSF is moving freight, for example, from New Orleans to Borger, and then paid a portion to PNR, now BNSF can only quote the rate to Panhandle. And that cost impact of that pricing on something that was never conveyed to PNR, it creates total uncertainty as to the economic impact to BNSF. And that's why the District Court's award of specific performance was proper here. Well, when I read the Illinois cases, though, it just looks like they're awfully particular about having specificity in the contract, giving a termination date for the contract. Otherwise, it's an at-will contract. I mean, you know, I mean, it's easy to look back, you know, in hindsight at the drafter of a contract, but it would have been very easy to put something in there if that was your intention. Your Honor, I think the parties here did provide the language necessary to strip this contract from the terminable at-will presumption. Because the first thing, as I said, PNR looks at only one, it only wants to terminate just a little slice of this contract. It is basic contract construction that you've got to look at the whole contract. So you'd be happy to just terminate the whole contract? I wouldn't. You could not, Your Honor. You cannot put this genie back in the bottle. And that's another reason why this is so distinct from an auto trim manufacturer and a sales representative. You cannot return these parties to their pre-contract status. Their obligations as common carriers are perpetual under federal railroad law. They can't stop, neither party can stop, providing service without regulatory approval. So in the Jesperson decision, that was 1998. Had Illinois law been the same and the Supreme Court stated that it was just entering what law was? Or was Jesperson a change of law? I don't think Jesperson was a change of law. And with all due respect to PNR, I don't read the case the same as them. Because Jesperson doesn't say that you dispense with the party's intent. And Jesperson doesn't say you can terminate only part of a fully integrated agreement. And in the first paragraph of Jesperson, it says this case involves a twist in the general rule because the contract in Jesperson had permissive provisions. One party may terminate if, if, if. The distributor could terminate for any reason or no reason with 30 days notice. So what the court did was it looked at that language and it tried to discern the party's intent. And they said based on these provisions, it shows an intent by these parties that their agreement be terminable at will, not terminable only for cause. So Jesperson makes perfect sense. And, Judge Higginson, I apologize. I kind of strayed a little from your question. But Jesperson cites two old Illinois cases. So this was not, you know, brand new law in terms of perpetual agreements. So these two parties negotiated the contract. They negotiated aware of this doctrine. I think they're charged with notice of what the state of the law is, in fairness. I think both sides are. And the, the, but Jesperson does not abrogate basic contract construction principles. That's what the district court did. It read the whole agreement. It treated nothing as meaningless. And it discerned the intent of the parties. And, and Baldwin and Piano was mentioned. Baldwin and Piano does an exercise that I think is, is useful here. Baldwin and Piano engrafted terminable will language into the agreement. And they said, does this make commercial sense now? So if you do that here, if you say, instead of until such time as the parties otherwise mutually agree, you say, either party may terminate this agreement at will. It doesn't make sense that these parties in the context of this. They are sophisticated. They are aware of the law. I mean, Judge Easterbrook with a great deal of confidence might say, I'm going to realize what the contract should have been. I mean, that, their argument is, this is asking courts to remedy an oversight. I, I don't think the court has to remedy any oversight. You think it's in the contract. I think this contract, it is implied by law that it's terminable for breach. And by necessity, it has to be until such time as you, the parties otherwise agree. Because otherwise, and this gets back to Judge Davis, one of your questions, about putting the parties back. So they keep the real estate. They keep the exclusive right for local freight services. And they take something for us. Baldwin speaks to that in terms of the stakes being reciprocal. And they're not reciprocal here. Because BNSF can't start going on their track. The law doesn't provide that. BNSF can't start serving customers all the way to board. BNSF can't compete with PNR to provide local services. Yeah, but when, when you sold the track, I mean, that was a special act of sale. It, it, you paid cash for the property and the track. You didn't have any provision that, that this was an installment sale. And, and, and payments from PNR would, would continue to pay for the track. I mean, that was a separate, completed deal as far as I could see. Your Honor, and I think the, again, the integration clause tells us that all the parts of this contract are integral. And they are telling, PNR is saying that their obligation to be the handling carrier. And that BNSF's exclusive reservation of its right to set rates and routes, they are saying they, they were free to eliminate that right whenever they wanted to. Well, I mean, I think that's an odd provision of Illinois law. Frankly, it's, it's really very tough. But, but how you can take just almost boilerplate language out of a contract and say it, it, it represents an intent to have a, a, a, a limited contract. I mean, I, I just, I, I, I'm, I'm having trouble with that. I understand, Your Honor. And I think the district court faithfully just stuck to basic contract construction. Four corners of the document. What's the intent of the parties? Well, I agree. He looked at the contract. But I, that's my problem is how you can say that these kind of boilerplate terms indicate the intent in the face of this, this, this law. And, and Your Honor, I don't think that the, I, again, I think the boilerplate language is, is different here. It's, it's far more robust than typical boilerplate language because it speaks to the fact that everything in this contract is important, that all the consideration is important to these parties, and it does not permit this slicing out of one thing. That defeats the party's intent. There would be no reason for them to have these, this, this lengthy discussion of what their arrangement was going to be on a go-forward basis if it could be jerked out from under them that quickly, just as in. I mean, they put in there that it was, you know, it'd run for 25 years and then be renegotiated or whatever. I mean. Well, Your Honor, they, they did provide a, a duration when they said until we otherwise mutually agree. Well, and, and, and, uh, what was that, that court of appeals case? RICO. Said that wasn't good enough. Well, and RICO relied on cases. It mentions Jesperson for the general presumption, but RICO relies on cases, a employment context. And it's well recognized in the employment context that you can't bind someone to an employment situation for eternity. Those contracts are treated as terminable at will. But this is, the exceptions, if you look at the cases where it goes a different direction, if you look at Baldwin Piano, if you look at Burford, those cases show that the parties there, considering their entire agreement, demonstrated an intent that their contract not be terminable at will. And, and that's the question that has to override everything here is did, does this contract show that BNSF on one hand and PNR on the other intended that their contract be terminable at will? And it does, it does not at all. And, and, except you've got to, you've got to rebut that presumption. It's, and I believe we have, Your Honor. It, it's, you know, perpetual contracts are disfavored. That's the state of the law in Illinois. And I think it's the state of the law in, in Texas and elsewhere. So you've got to look at what the parties intended to happen in the contract. And the notion, I do, I want to correct the notion that PNR was just on the brink of financial disaster because the record simply doesn't bear that out. And the record reflects that PNR was making net income in excess of $7 million in the two years before it proceeded to terminate this contract. The record also reflects that in 2017, in one year of claiming one part of the agreement was terminated, in one year, PNR made an extra $5.1 million. And that's the kind of inequity that Baldwin-Piano and Burford and the case— I don't see how we can, can, can find out what the state of mind of the parties were when they entered into this agreement. I mean, I don't think the record is, there's anything in the record to determine that. I mean, we don't know whether, whether your client was losing money on that line to be willing to sell it for scrap value. We don't know what their motivation was. And we don't know what PNR, PNR obviously thought it was going to be, it was worth taking a risk to pay a million dollars for it. You know how big a risk that was? I don't know. Your Honor, we actually do know. Because it just so happens that the persons that negotiated this agreement, the person that, the attorney from BNSF that was the primary drafter, the two gentlemen from PNR that were primary negotiators, they were all deposed in this case. They're all still around, and they all testified. Well, to begin with, I'm not sure that that's something proper for us to look at. I mean, I think that the primary place we look is to the words of the contract. I agree, Your Honor. I think that's what the district court did precisely. It looked at all the words of the contract. But the district court had before it that testimony. It was part of the summary judgment record, and it's part of the record on appeal at 40016 through 27. And to be fair, that's from our brief. It's a summary of that testimony being quoted in our summary judgment briefing. Really, are there any Illinois cases from the state court that look at the economic sort of figure out whether it was, you know, how sweet the deal was? I have not seen an Illinois state court case. But I will say this, Your Honor. The context here is flipped. In these cases, and again, different context, sales representatives, a toy salesman, I believe, in RICO. In those contexts, the party that had the bigger bundle of rights and had given some to a salesman or distributor, et cetera, that party who has the right to distribute or whatever is seeking to say that the party with a larger bundle of rights didn't have the right to terminate them. So this would be more analogous if it was BNSF claiming this is terminable at will. But here you have the reverse situation. It's as if in Jesperson, Jesperson was telling 3M, I'm sorry, 3M was telling Jesperson, it's a flip. Because there, 3M terminated Jesperson. Do you trust this argument that the railroad situation is unique, or is it that Jesperson really is limited to employment-type contracts? It's railroads. The context is important, Your Honor. And railroads are unique. It's different. In none of these cases is the party's core obligation grounded in federal law and not subject to termination absent regulatory approval. The entire agreement was subject to regulatory approval. So the importance of the structure of federal law that lays over the railroad contracts, it can't be ignored here. If the parties had mutually agreed to revise? I'm sorry, Your Honor? If the parties had mutually agreed to terminate this, do you agree that PNR would then have kept the railroad? I think it, well, it depends, Your Honor. That would be subject to regulatory approval. Other than federal regulatory approval, they would have kept it. So if that was a possibility, why does it make it absurd that that happened even over your objection? I'm sorry, I'm not totally following your question. Well, your interpretation of the contract is that the two parties could agree to terminate their relationship. And I'm thinking in that case, they would have the line. They have been quit-claimed the real estate. So, and, you know, if you look at Exhibit 1-4. Then the reason I'm asking that is why would it be, why would, was the district court right that it would be absurd to have that be the option? You could have ended up with exactly the consideration. And, Your Honor, I would say that the parties could amend and enter into an agreement that could have a litany of different perspectives. But that agreement does not give P&R the right to set rates. It does not. And it makes no sense that by terminating only a slice of this contract, they magically acquire something they did not pay for. When they set rates, his point was no damage to you. And I disagree, Your Honor. I disagree because what the district court relied on is uncertainty with the future. Because no one knows what they're going to do with their rates. What P&R is going to do. And no one knows the impact of a higher rate from P&R. We had testimony at trial. One of the customers was looking at moving to truck. Okay. Well, if that customer moves to truck, then BNSF is doing less business with that customer. We have no way to know when we sit down with a large petrochemical customer that has served in multiple locations throughout the United States. How does that impact our ability to serve them at a facility, say in Alabama, if the prices have arisen on the first or last 31 miles in the Panhandle of Texas? There is no way to know what that damage is going to be. Quickly also, then, on that point, if they enhance — what was the enhanced surcharge that led to the breach on the second issue? I don't think they identified it. I don't think they identified it at all. I think that's part of the problem. They just throw it out there and hope it sticks. And the Eighth Amendment — you know, and mind you, these parties are still amending this in 2016. In 2016, they are. But they don't identify the surcharge. The Eighth Amendment is the only agreement that they're willing to embrace all the language of. In the Eighth Amendment, it says if they want to impose any charge on any customer, it's got to have that customer's consent. So before BNSF does anything wrong, or potentially could, they've got to show that. And they simply had no evidence at all of any customer consent. And this was — I understand that's the way the district court read it. But the other interpretation is it gave PNR two tracks. It could get consent of the customer. Failing to do that, it could get your consent. Your Honor, my reading of the third paragraph of the Eighth Amendment is that customer consent is absolutely required. I understand that's the way the district court read it. But, you know, there's a counter-interpretation of that. And respectfully, Your Honor, I don't see the other — I don't see the agreement. And I'm out of time. So I will yield the remainder. Would it — in your mind, or in your — would your position be any different if this — if y'all had operated for 50 years or 100 years? I think, certainly, it seems more egregious as more time goes on. I know we talked about absurd results. And I think there's some in the briefing about the day after being an absurd result. I think 23 years later is an absurd result. It does seem more absurd as more time passes on. But, you know, I don't think that necessarily matters. You've still got to find it in the contract, don't you? To — whether it's 5 years or 20 years or 100 years. I think you do have to look at the contract, Your Honor. I agree. Thank you, counsel. Rebuttal. What about the fact that you're just wanting to terminate one slice of the contract? So the slice we want to terminate is the part that's still being performed. I mean, they sold us the railroad. We paid a bunch of money for the railroad. And as part of our agreement, we put in place this handling carrier agreement I was waving around earlier with the various ways we're going to handle these trains. We have the right to terminate that at will. And so we're not — that's what's left. There's nothing else to terminate or not terminate. It plays out over time. It has a different subject matter. But we're not — that's — there's no part of anything. That's what's left. The party's deal was to give us the real estate and we would have this ongoing relationship. We're done with the relationship. It can be terminated. We have that right. That's that. So it's — there's just a bunch of words about integration and whatnot and some boilerplate language in the contract. But the piece of it that was negotiated to still be ongoing is the piece that we're dealing with. And that's fair because that's the part of it that's still in play and still subject to our — the ongoing obligations of the contract, which is, I think, a fundamental problem with the argument you just heard. There's not one case, not one, from Illinois in this Erie case where there is an ongoing business relationship with ongoing back-and-forth communication and dealing between the parties. Look at Section 3 for all that material that has not been found to be terminable at will. And the more they talk about the importance of this obligation and how you need to have all this, well, that puts the burden on us. We've got to make investments to do that. We've got to work to do that. We've got to try to accommodate the customers and do the other things. And we don't have to do that if we don't want to do that after 26 years. Is it going to be 30 years? Is it going to be 50 years? I mean, that is the concern. The district court voice, then, it would have been the same argument after one month. Sure. That's a business risk that both parties chose to run. I mean, the plant could have shut down. This whole thing could have been worthless, depending on whether the economy had bounced a different direction. BNSF could have gone bankrupt. Everyone just thought it was a good idea, business-wise. Relationship-wise, we were getting along. We had some early amendments that went through, no problem. And off we went. 26 years has now passed. Jesperson cites a case from this court. It's a Blockbuster case. The Blockbuster video rental empire was falling apart. And it touches on the other aspect of Illinois law that hasn't been addressed in the last remark. There are cases that talk about implying a term in a contract to recoup an investment, to give you some finite target to hit at, a finite event of termination. This court said in this Blockbuster case, we don't have to look at what a reasonable duration would have been, because it clearly has been enough time already. And whatever it was, the value they perceived in this relationship going on, if lucky, if the plant stayed open, if it stayed profitable, if, if, if, surely, after a quarter of a century, and probably a century after they'd recouped their investment in this rail line, something would allow it to go. Those are the two weaknesses under Illinois law. This ongoing business relationship, no case lets them do that, and the lack of any finite event of termination. These cases that choose not to apply Jesperson all do so by finding a way to terminate. If you look at them, they say, they say that their specifics, they, and that forecloses a place for the presumption. They don't want that. They want it forever. There's no term. There's no implication. It's simply our whim. And whether or not that is unprofitable to us, or the degree to which it's unprofitable, that's not a relevant consideration. As you said, Judge Davis, we look at what the document actually says, and what the parties agreed to. Couple of notes. Can you answer his remark about, if we look at the summary judgment testimony, that the very people that confected this spoke to it being perpetuity? I haven't. You'll, you'll see a lot of BNSF people saying, of course, we would have, we wanted it to last forever, and that's why parole evidence is not reliable. One of those witnesses, BNSF witnesses, is Dennis Wilson, in-house lawyer, who says they chose Illinois law for all their agreements because they knew it, understood it, and liked the predictability of having it. So to the extent any of that parole evidence bears on anything, it's they kept choosing the law where they, everybody knew what the effect of it was under Jesperson and the cases it cited. Do you agree with him? Jesperson just reiterated existing law in Illinois? I think it, it clarified it and applied it in a fact pattern where it maybe hadn't been clear before, and it explained the underlying policies in ways that it just not had a chance to do before. So, sure, it faithfully follows earlier precedent, but it's an evolution and a significant one in that law. Plain text of the agreement, we could assign it. We're going to assign a money-losing contract? That doesn't make any sense. You look at the termination provision. That's what Jesperson says. Is there a federal regulatory requirement for you to terminate? So, I don't know, is the quick answer. Let me back up, though. We're a common carrier on the line. I mean, we, the only question here is whether Section 3 is in place or not in place. Freight is going to move, people are going to get paid, stuff's going to move around one way or the other. That's perpetual. No question about that. Federal law makes it be that way. The overlay is the question for this case. And if there's a more specific question about regulation, I may have misanswered it just now, but that was what I was trying to speak to on the contract. Thank you, Your Honor. Thank you, counsel. The court will take this matter under advisement and call the next case. Clause number 18.